

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| RIDGEFIELD PERMIAN, LLC AND ALBERT JEFFRYES GRIFFITHS, AS TRUSTEE OF THE ALBERT JEFFRYES GRIFFITHS TRUST, | § § § § | No. 08-19-00156-CV<br><br>Appeal from the<br><br>143rd District Court |
| Appellants, | § | of Reeves County, Texas |
| v. | § | (TC# 18-05-22426-CVR) |
| DIAMONDBACK E & P LLC AND MAGNOLIA, LLC, | § § | |
| Appellees. | § | |

## **O P I N I O N**

This is another dispute coming before us whose origin traces back to a 1999 tax foreclosure of several hundred property interests in Reeves County, Texas. In 2020, we decided *Mitchell v. Map Resources, Inc.*,[1] a case arising from the same foreclosure suit, in which the heirs of one of the purported tax debtors presented a collateral attack against the 1999 judgment based on allegations of due process violations. Here, the dispute differs from *Mitchell* as no similar attack

---

[1] *Mitchell v. Map Res., Inc.*, 615 S.W.3d 212, 215 (Tex. App.—El Paso 2020, pet. filed).

is made on the judgment per se. Rather, Appellants merely dispute the scope of property interests foreclosed upon by the tax suit pursuant to Texas real property and tax law. On cross-motions for summary judgment, the trial court declared that Appellee Magnolia, LLC—as successor to the tax-sale purchaser—holds superior title to the interest at issue here, a one-fourteenth mineral estate in the subject tract. On appeal, Appellants argue the tax judgment foreclosed upon—and the sheriff's deed conveyed—only the tax debtor's royalty interest then existing under a producing mineral lease but not lessor's possibility of reverter. Finding error, we reverse and render judgment for Appellants.

## I. BACKGROUND

### *The Parties[2]*

The Trust and Magnolia both purport they obtained the same one-fourteenth interest in the mineral estate of a section of land in Reeves County when an oil-and-gas lease automatically terminated in 2012. Magnolia—believing the minerals reverted to it—entered into a new oil-and-gas lease, which is now owned by Diamondback. The Trust, also believing the minerals reverted to it, entered into its own oil-and-gas lease, which is now owned by Ridgefield.

### *The Land & The Lease*

The land in dispute in this case has a long history in the Jeffryes family. By 1965, Alberta Jeffryes Griffith (Mrs. Griffith) owned a one-seventh interest in both the surface and mineral estates of the subject tract.[3] Mrs. Griffith died intestate on December 15, 1974, having never conveyed any interest in such tract during her lifetime. Upon Mrs. Griffith's death, the following

---

[2] For this appeal, we refer to Appellants as follows: Ridgefield Permian, LLC (Ridgefield) and Albert Jeffryes Griffiths, as Trustee of the Albert Jeffryes Griffiths Trust (the Trust) (collectively, Appellants). While Appellees are referred to as: Diamondback E & P, LLC (Diamondback) and Magnolia, LLC (Magnolia) (collectively, Appellees).

[3] The subject tract refers to Section 5, Block 7, H&GN RR Co. Survey, Abstract No. 356, Reeves County, Texas, containing 636.3 acres, more or less.

interests in the subject tract were conveyed to her surviving heirs: one-twenty-first in fee simple to each of her sons—David Royer Griffith (David) and Albert Jeffryes Griffith (Albert)—and one-twenty-first in a life estate to her husband, David W. Griffith (Mr. Griffith). Upon the termination of Mr. Griffith's life estate, the interest was to be split evenly between David and Albert.

In 1975, Mr. Griffith, David, and Albert (the Griffith Lessors) executed an oil-and-gas lease (the Meriwether Lease) in favor of D.E. Billings (Billings), covering the subject tract. The lease is a three-page document titled, "Oil, Gas and Mineral Lease," and it contains the Producer's 88 designation. Although the copy provided for our record is of poor quality and appears with very small print, the lease terms themselves are not disputed by the parties. Under the Meriwether Lease, the Griffith Lessors, who each owned an undivided one-twenty-first of the minerals in the subject tract, reserved a one-eighth royalty. The lease contained a three-year primary term and was perpetuated into its secondary term by production from the Meriwether No. 1 Well (the Meriwether Well) drilled on the subject tract.

*The Tax Proceedings*

By 1998, there was a relatively small tax debt owed by Mr. Griffith and Albert on the royalties received respectively under the Meriwether Lease. On July 23, 1998, Reeves County, the Pecos-Barstow-Toyah ISD, and the Reeves County Hospital District (the Taxing Authorities) filed suit (the Tax Suit) against several hundred defendants, including Mr. Griffith's life estate and "Jeffryes Griffith," seeking to collect the unpaid taxes under the terms of the Meriwether Lease.[4] As to each defendant, the specific interests being foreclosed upon was identified in a spreadsheet attached to the petition as an exhibit. On the exhibit, both interests relevant to this appeal were

---

[4] All parties agree that the interest referred to in the exhibit as being owned by "Jeffryes Griffith" is the interest owned by Albert.

3

described as 0.005952 decimal interests in the Meriwether Lease, operated by Richard A. McDonald, in Section 5, Block 7, H&GN Survey, Abstract 356. Such a decimal interest accurately represents a one-eighth royalty on a one-twenty-first mineral interest.[5]

By judgment from the 143rd District Court of Reeves County, dated February 19, 1999 (the Tax Judgment), the Taxing Authorities foreclosed upon the various interests as described in another exhibit attached to the Tax Judgment. On March 3, 1999, the Reeves County Clerk issued an Order of Sale to the sheriff, which also described the interests authorized to be sold in an exhibit. By Sheriff's Tax Deed (Sheriff's Deed) dated April 6, 1999, the Reeves County Sheriff sold certain foreclosed interests, each of which was described in an exhibit to that document. The interests previously owned by Mr. Griffith and Albert (together referred to as the Tax Debtors) were included in each of the exhibits attached to those documents.

*Subsequent Transfers and Lease Termination*

On June 14, 2008, Albert granted whatever interest(s) he still owned in the subject tract to the Trust. Meanwhile, the tax-sale purchaser conveyed whatever interest(s) it purchased in the tax sale to Magnolia. In October 2012, the Meriwether Well on the subject property stopped producing, causing the lease to automatically terminate. Accordingly, the working-interest owners—McDonald Investment Corporation, as trustee for the McDonald Family Trust and Richard McDonald—released the Meriwether Lease on April 24, 2013. On August 6, 2015, Magnolia—believing the possibility of reverter had been foreclosed upon, sold by the sheriff, and transferred to it—then executed an oil-and-gas lease covering the property with Finley Resources, Inc. After a series of assignments, Diamondback acquired the leasehold interest formerly held by Finley Resources, Inc.

---

[5] One-eighth (1/8) of one-twenty-first (1/21) equals one-one-hundred-and-sixty-eighth (1/168) or 0.005952 (rounded to the nearest millionth).

4

On November 7, 2016, the Trust—believing the possibility of reverter had never been foreclosed upon—executed its own oil-and-gas lease with Ridgefield Energy Investments, LLC. On June 27, 2017, Ridgefield Energy Investments, LLC transferred its interest under that lease to Appellant Ridgefield. Ridgefield and the Trust sued Magnolia and Diamondback, seeking to quiet title, among other claims. The parties filed competing motions for summary judgment on the issue of whether the possibility of reverter had been foreclosed by the Taxing Authorities and sold by the Reeves County Sheriff. The trial court granted summary judgment quieting title in favor of Magnolia and Diamondback. Upon the trial court entering a final judgment, this appeal followed.

## II. ISSUES ON APPEAL

The Appellants enumerate four issues on appeal: (1) whether the trial court erred in ruling that the possibility of reverter was foreclosed upon; (2) whether the trial court erred in ruling that the possibility of reverter was conveyed by the Sheriff's Deed; (3) whether the trial court erred in ruling that a possibility of reverter is an interest in an oil-and-gas lease; and (4) whether, after a horizontal severance, a possibility of reverter remains attached to the surface estate or is part of the mineral estate.

Because we view all four issues as being interrelated, we combine them into a single issue for review.

## III. THE SCOPE OF THE TAX FORECLOSURE

The parties dispute the scope of the tax judgment and subsequent Sheriff's Deed. Specifically, the dispositive issue is whether the possibility of reverter in the minerals conveyed by the Meriwether oil-and-gas lease was foreclosed upon by the tax judgment and subsequently conveyed by the Sheriff's Deed at issue. For the reasons below, we conclude such contingent interest was not then foreclosed. Because Appellants do not challenge the validity of the tax

5

judgment or Sheriff's Deed as to the royalty interest, we further conclude there are no procedural bars to Appellants' claims of superior title over the minerals which had only reverted back to the lessor upon the termination of the determinable estate due to the lack of production from the Meriwether Well.

## A. Standard of Review

This Court reviews a trial court's summary judgment *de novo*. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accid. Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Under the traditional standard for summary judgment, the movant has the burden to show that no genuine issue of material fact exists and that the trial court should grant a judgment as a matter of law. TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). When reviewing a summary judgment, the Court takes as true all evidence favorable to the nonmovant and indulges every reasonable inference and resolves any doubts in the nonmovant's favor. *Dorsett*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215.

When both sides move for summary judgment on the same issue, each bears the burden of establishing that it is entitled to judgment as a matter of law; neither side can prevail merely because the other side failed to meet this burden. *City of Garland v. Dallas Morning News*, 969 S.W.2d 548, 552 (Tex. App.—Dallas 1998) (en banc), *aff'd*, 22 S.W.3d 351 (Tex. 2000). On appeal, the appellate court reviews all summary-judgment evidence, determines all questions presented, and renders the judgment the trial court should have rendered. *Dorsett*, 164 S.W.3d at 661. The appellate court may affirm the judgment, reverse and render judgment for the other side, if appropriate, or reverse and remand if neither party has met its summary-judgment burden. *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 50

(Tex. App.—Dallas 2006, pet. denied). When, as here, the trial court's summary judgment order does not state the basis for the trial court's decision, the appellate court must uphold the order if any of the theories advanced in the motion are meritorious. *Knott*, 128 S.W.3d at 216.

### B. Mineral Interests Overview and Taxation

#### 1. Mineral Property Ownership and Right to Severance

It is long settled in Texas that, "minerals in place are realty, and as such are subject to ownership, severance, and sale . . . ." *Hager v. Stakes*, 294 S.W. 835, 842 (Tex. 1927). Thus, if a fee owner makes a grant or reservation of mineral interests, such conveyance effects a horizontal severance and creates two separate and distinct estates: a surface estate and a mineral estate. *Acker v. Guinn*, 464 S.W.2d 348, 352 (Tex. 1971). A severed mineral estate generally includes five attributes: (1) the right to develop minerals, also known as the right of ingress and egress; (2) the right to lease, also known as the executive right; (3) the right to receive bonus payments; (4) the right to receive delay rentals; and (5) the right to receive royalty payments. *See Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986) (citing R. Hemmingway, *Law of Oil and Gas* §§ 2.1–2.5 (1971)). These attributes are collectively known as the bundle of sticks that make up a mineral estate. *See Lesley v. Veterans Land Bd. of State*, 352 S.W.3d 479, 480-81 (Tex. 2011). Each stick of the bundle is an independent property right which itself may be severed into a separate interest whether separately conveyed or reserved by the owner. *Concord Oil Co. v. Pennzoil Expl. & Prod. Co.*, 966 S.W.2d 451, 457 (Tex. 1998) ("The owner of a mineral interest may convey one or more, or fractions of one or more, of any attribute of the mineral estate, including but certainly not limited to a fraction of the mineral interest, a fraction of royalties, the right to receive delay rentals, and the executive rights.").

Generally, the mineral estate can be severed from the surface estate either "by a grant of the minerals in a deed or lease, or by reservation in a conveyance." *See Moser v. U.S. Steel Corp.*,

676 S.W.2d 99, 101 (Tex. 1984). Thus, the Supreme Court of Texas has noted that an oil-and-gas lease is not a lease in the traditional sense of a lease of the surface of real property. *Natural Gas Pipeline Co. of America v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003). Rather, in a typical oil-and-gas lease:

> [T]he lessor is a grantor and grants a fee simple determinable interest to the lessee, who is actually a grantee. Consequently, the lessee/grantee acquires ownership of all the minerals in place that the lessor/grantor owned and purported to lease, subject to the possibility of reverter in the lessor/grantor. The lessee/grantee's interest is "determinable" because it may terminate and revert entirely to the lessor/grantor upon the occurrence of events that the lease specifies will cause termination of the estate.

*Id.* (citations omitted); *Luckel v. White*, 819 S.W.2d 459, 464 (Tex. 1991) (citing *Stephens County v. Mid–Kansas Oil & Gas Co.,* 113 Tex. 160, 173-74, 254 S.W. 290, 295 (1923)) ("In Texas, a typical oil and gas lease actually conveys the mineral estate (less those portions expressly reserved, such as royalty) as a determinable fee." ). As such, the fundamentals of mineral ownership pertain to oil-and-gas leases as they do to other conveyances.

Notably, by executing an oil-and-gas lease, the lessor retains a reversionary interest—usually called a possibility of reverter—in the mineral estate. *Luckel,* 819 S.W.2d at 464. Though not presently possessory, the possibility of reverter is presently vested at the time the lease is executed. *BP Am. Prod. Co. v. Laddex, Ltd.*, 513 S.W.3d 476, 480 (Tex. 2017) (citing *Jupiter Oil Co. v. Snow*, 819 S.W.2d 466, 468 (Tex. 1991)). "The 'possibility of reverter' is the real property term of art for what the grantor owns as a future interest in a determinable fee grant; it is the grantor's right to fee ownership in the real property reverting to him [or her] if the condition terminating the determinable fee occurs." *Luckel*, 819 S.W.2d at 464 (citing 2A R. Powell, THE LAW OF REAL PROPERTY, ¶ 270[9] at 20–17 (P. Rohan ed. 1991)). The reverter only takes effect, if at all, if the condition terminating the fee simple determinable does *in fact* occur. *Id.*

8

## 2. Taxation of Property in Texas

Article VIII, section 1 of the Texas Constitution provides that "[a]ll real property and tangible personal property in this State, unless exempt . . . shall be taxed in proportion to its value, which shall be ascertained as may be provided by law." TEX. CONST. art. VIII, § 1. The Texas Tax Code defines "[r]eal property" as including "a mineral in place[,]" and "an estate or interest" in a mineral in place. TEX. TAX CODE ANN. § 1.04(2); *Matagorda Cty. Appraisal Dist. v. Coastal Liquids Partners, L.P.*, 165 S.W.3d 329, 332 (Tex. 2005). The Supreme Court of Texas has further explained that a single tract of real property may include several aspects of realty; thus, some aspects of the real property can be taxed separately even though all aspects of it are part of the same surface tract. *Coastal Liquids*, 165 S.W.3d at 332, 334. For example, a royalty right is taxable as a real property interest. *See Sheffield v. Hogg*, 77 S.W.2d 1021, 1024 (Tex. 1934).

With regard to tax delinquency, Article VIII, Section 15 of the Texas Constitution states that "all property, both real and personal, belonging to any delinquent taxpayer shall be liable to seizure and sale for the payment of all the taxes and penalties due by such delinquent; and such property may be sold for the payment of the taxes and penalties due by such delinquent . . . . " "Such property[,]" referred to in the third clause of article VIII, section 15, includes "(1) the real property that is the subject of the tax and to which the special lien has attached and (2) all property owned by the delinquent taxpayer." *Dallas Cent. Appraisal Dist. v. Wang*, 82 S.W.3d 697, 704 (Tex. App.—Dallas 2002, pet. denied).

## C. Analysis

Relevant to this appeal, there are six significant dates between 1974 and 2012 pertaining to changes in ownership of various interests in the subject tract. For our purposes, we find it helpful to frame the analysis by tracking the nature of the interest owned by each party at each juncture. As a reminder, prior to Mrs. Griffith's death in 1974, she owned a one-seventh interest in both the

9

surface and mineral estate of the subject property in fee simple.

### 1. Mrs. Griffith's One-Seventh Interest in Fee (1974)

By intestate grant, Mrs. Griffith's interests were conveyed to the Griffith Lessors, each of them owning a one-twenty-first interest in both the surface and mineral estates. Mr. Griffith's interest was in a life estate only, with remainder to David and Albert. Each of those interests represented an even share of the one-seventh interest that was owned by Mrs. Griffith prior to her death. Ownership at this juncture is uncontroverted.

### 2. The Meriwether Lease (1975)

When the Griffith Lessors executed the Meriwether Lease in favor of Billings in 1975, this effected a horizontal severance of the surface and mineral estates and Billings became the owner of the minerals in fee simple determinable. *See Pool*, 124 S.W.3d at 192; *Luckel*, 819 S.W.2d at 464; *Stephens County*, 254 S.W. at 295. The Griffith Lessors also reserved a one-eighth royalty under the terms of the lease. After the Meriwether Lease was executed, each of the Griffith Lessors owned the following: (1) a one-twenty-first interest in the surface estate; (2) a one-twenty-first royalty interest in one-eighth of the minerals produced under the Meriwether Lease; and (3) a possibility of reverter in one-twenty-first of the minerals. Ownership at this juncture is uncontroverted.

### 3. Mr. Griffith's Death (1992)

When Mr. Griffith died in 1992, his life estate in the subject tract terminated and his interest was split evenly between David and Albert. As a result, David and Albert then each owned: (1) a one-fourteenth interest in the surface estate; (2) a one-fourteenth royalty interest in one-eighth of the minerals produced under the Meriwether Lease; and (3) a possibility of reverter in one-fourteenth of the minerals. Ownership at this juncture is uncontroverted.

### 4. The Tax Foreclosure (1999)

In 1999, the Taxing Authorities foreclosed upon a tax lien for unpaid taxes on royalties under the Meriwether Lease that had been paid to Albert, as well as royalties that had been paid to Mr. Griffith's life estate. "Article VIII, section 15 provides (1) a special lien attaches annually to real property for the assessed taxes; (2) the taxing authority can seize and sell all property belonging to a delinquent taxpayer for the payment of the delinquent taxes; and (3) 'such property' may be sold for the taxes owed by the delinquent taxpayer pursuant to statutory regulations." *Wang*, 82 S.W.3d at 704. The property referred to in article VIII, section 15's third clause refers to: "(1) the real property that is the subject of the tax and to which the special lien has attached and (2) all property owned by the delinquent taxpayer." *Id*.

Of course, by then, Mr. Griffith's life estate had terminated and one-half of this interest was included in Albert's then-current interests. It is undisputed that taxes were paid up to date on the surface estate and the surface estate was not included in the 1999 foreclosure. Additionally, because a possibility of reverter is a non-taxable interest, there could not have been delinquent taxes on that interest. *See Texas Turnpike Co. v. Dallas County*, 271 S.W.2d 400, 402 (Tex. 1954) (holding that, like a contingent remainder in property, a possibility of reverter is not a taxable title). As a result of the foregoing, Appellants argue that the Tax Judgment of 1999, under Texas law, could only foreclose on the one-fourteenth royalty interest under the Meriwether Lease then owned by Albert, and we agree.

Magnolia, however, argues that the tax lien foreclosure extended to Albert's one-fourteenth mineral interest and appurtenant rights in the mineral estate(s) to include the possibility of reverter. To support that assertion, Magnolia points to Article VIII, Section 1 of the Texas Constitution, which provides that "[a]ll real property and tangible personal property in this State, unless exempt . . . shall be taxed in proportion to its value, which shall be ascertained as may be provided by

11

law." TEX. CONST. art VIII, § 1. Magnolia then points to a definition of "[r]eal property" from the Texas Tax Code as including minerals in place and interests in minerals in place. TEX. TAX CODE ANN. § 1.04(2). Magnolia reasons that because a possibility of reverter is a future interest in the minerals in place, it falls under the definition of real property and must be taxable. But Section 1.04 of the Tax Code defines words used in the code; it does not purport to define words used in the Texas Constitution. *See id.* § 1.04. The Supreme Court of Texas has explicitly held that a possibility of reverter is not taxable. *Texas Turnpike Co.*, 271 S.W.2d at 402. Thus, we do not agree that the definition of "real property" found in the Texas Tax Code—in conjunction with the use of the phrase in the Texas Constitution—means that a possibility of reverter is taxable.

Alternatively, Appellees argue that a possibility of reverter is subject to foreclosure along with a royalty interest. As support for this position, Appellees cite to Article VIII, Section 15 of the Texas Constitution, which reads as follows:

> The annual assessment made upon landed property shall be a special lien thereon; and *all property*, both real and personal, belonging to any delinquent taxpayer shall be liable to seizure and sale for the payment of all the taxes and penalties due by such delinquent; and such property may be sold for the payment of the taxes and penalties due by such delinquent, under such regulations as the Legislature may provide.

TEX. CONST. art. VIII, § 15 (emphasis added). But the *Richey* case, which held that a property lien for unpaid taxes attaches only to the property against which the delinquent taxes were assessed, addressed the language of article VIII, section 15, and performed a historical analysis explaining why there is no contradiction. *See Richey v. Moor,* 249 S.W. 172, 173 (Tex. 1923). As the *Richey* Court explained, the previous Texas Constitution (of 1869) contained substantially similar language. *See id*. Prior to the adoption of the current Constitution in 1876, that language from the Constitution of 1869 had been definitely declared by the Supreme Court of Texas to provide for the attachment, not of the property of a delinquent taxpayer generally, but only of each separate

12

tract or parcel of land for the taxes assessed against it. *See id*. Because the meaning of the language had been declared by the highest court in the state, and then the same language was retained in the Constitution of 1876, the Supreme Court of Texas reasoned that the same meaning must be given to the new Constitution. *See id*.

Next, Magnolia's argument that the possibility of reverter could be included in the foreclosure and sale relies on Section 32.05 of the Tax Code, which states that a tax lien on a property interest takes priority over a possibility of reverter. But this does not mean that a tax lien takes priority over a possibility of reverter not attached to the interest that is subject to the tax lien. Here, the tax lien was on the royalty interest only; the possibility of reverter did not derive from the royalty interest, it was not part of the royalty interest, and it was not attached to the royalty interest.

Finally, the Appellees also point to *Pounds v. Jurgens*, a Fourteenth Court of Appeals case where, inverse to the circumstances at issue here, a tax delinquency arose on the surface estate of the property but not on the royalty interest derived from a mineral lease on the property. *See* 296 S.W.3d 100, 106 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). Appellees argue, in effect, that *Pounds* stands for the proposition that a foreclosure on a surface estate for delinquent taxes would also extinguish by foreclosure the possibility of reverter which was not separately assessed or taxed. Although we agree with the reasoning of *Pounds*, we disagree with Appellees' characterization of the case. In *Pounds*, like here, the subject tract was severed into separate surface and mineral estates. *Id*. at 103. In 1929, the owner of the subject tract executed an oil-and-gas lease covering her land, granting a fee simple determinable in the mineral estate to the lessee, while reserving a one-eighth royalty interest in the minerals to be produced from the land. *Id*. By virtue of her grant in fee simple determinable, she then also owned a possibility of reverter. *Id*. Over the

13

years, her interest in the surface estate, royalty interest, and possibility of reverter passed to her descendants, collectively referred to as "Jurgens." *Id*. From 1983 to 1986, various taxing authorities sought foreclosure of tax liens against the surface estate of the subject tract. *Id*. The taxing authorities recovered a judgment against the surface estate and the property was deeded to the City of Alvin in trust in 1987. *Id*. at 104. The city then sold the property to Pounds in 1988. *Id*. By 2000, both Pounds and Jurgens were claiming royalties under the 1929 lease. *Id*. The lessee deposited the one-eighth royalty with the court's registry and filed a petition in interpleader naming Pounds and Jurgens as defendants. *Id*. Pounds and Jurgens each answered and filed various claims against one another including to quiet title in the royalty interest and possibility of reverter. *Id*. The trial court held that the tax judgment only foreclosed upon the surface estate and not on the royalty interest nor the possibility of reverter, meaning Pounds only had rights to the surface. *Id*.

Pounds appealed, and the trial court's determination regarding the royalty interest was upheld, but its determination regarding the possibility of reverter was reversed. *Id*. at 111-12. The court of appeals reasoned that under the 1929 lease, the lessee acquired title to all of the minerals in place and the lessor reserved a right to receive a one-eighth royalty and also owned a possibility of reverter. *Id*. at 108. The court determined that, at the time the lease was executed, the royalty interest and the possibility of reverter remained a part of the surface estate, having never been severed. *Id*. at 108. The court noted that the lessor or her heirs could have, at any time, conveyed any one or any combination of their three interests, but because they did not do so, they were never severed from one another until the tax judgment. *Id*. The court determined that the foreclosure on the surface estate severed the royalty interest because it was taxed separately, and those taxes were paid up to date. *Id*. at 108–09. But the court held that the royalty interest was the only interest severed from the surface estate by the Tax Judgment, meaning the foreclosure of the surface estate

14

included the possibility of reverter. *Id*. Therefore, the deed to Pounds, which granted the surface estate, carried with it the possibility of reverter. *Id*. at 109.

Applying that analysis to the facts of this case, when the Griffith Lessors executed their oil-and-gas lease with Billings in 1975, the possibility of reverter remained attached to the surface estate until the lease terminated in 2012. Taxes were paid on the surface estate from 1975 to 1999 and beyond, and Appellees do not allege that the Tax Judgment included the surface estate. Although the 1999 Tax Judgment severed and foreclosed upon the royalty interest, Albert continued to own his interest in the surface estate which carried with it his interest in the possibility of reverter.

Moreover, our conclusion that the Taxing Authorities could not have foreclosed on the possibility of reverter is also consistent with the plain language of the Tax Judgment itself. Dated February 19, 1999, the Tax Judgment foreclosed upon various interests described in an exhibit to that document. The exhibit to the Tax Judgment contains three separate lists of defendants and properties. The first list is the list for taxes owed to Reeves County, the second list is for taxes owed to Pecos-Barstow-Toyah ISD, and the third list is presumably for taxes owed to the Reeves County Hospital District, although the first five pages—including the title of the document and defendants with alphabetic names prior to "Davis William Fred"—of that list appear to be missing from our record. At any rate, each list contains the two interests relevant to this appeal. On the first list (detailing the delinquent taxes owed to Reeves County), the descriptions of the two interests relevant to this appeal include the names of the Tax Debtors, the name "MCDONALD RICHARD A," the word "MERIWETHER," the specific section of land covered by the lease, the 0.005952 decimal equivalent to each Tax Debtor's royalty interest, and the taxes owed.

The recitation of the two interests on the second and third lists are identical to one another,

and vary only slightly from the recitation in the first list. The interests relevant to this appeal are described on the second and third lists in the exhibit to the Tax Judgment as follows:

GRIFFITH DAVID W LIFE EST      M000138410003902
MERIWETHER H&GN BLK 7 SEC 5      0.005952

GRIFFITH JEFFRYES      M000138410003906
MERIWETHER H&GN BLK 7 SEC 5      0.005952

Each of these lists also identifies the tax owed by each defendant. Of note is the continued inclusion of the word "MERIWETHER" and the decimal equivalent to each Tax Debtor's royalty interest. On review, we find that the plain language of the Tax Judgment only specifically described the two royalty interests under the Meriwether Lease. As a result, we determine that the only interest that changed ownership by operation of the Tax Judgment was the royalty interest formerly owned by Albert.

### 5.  The Sheriff's Deed (1999)

Later in 1999, the Reeves County Sheriff executed a Deed conveying the foreclosed-upon interests relevant to this appeal to M Brad Bennett, Inc. The Sheriff's Deed purports to convey:

> [U]nto the said Grantee all of the estate, right, title and interest which the Defendants in such suit had on the date said judgment was rendered or at anytime afterwards, in and to the royalties, mineral interests and/or overriding royalty interests of all Defendants, herein above named, as foreclosed in Suit No. 98-07-16,094-CVR, hereinabove described, without warranty of any kind, as described in the Order of Sale, viz: See Exhibit "A"[.]

In Appellees' view, the above-quoted sentence should be interpreted to convey all mineral interests owned by the Tax Debtors in the subject tract. Appellees rely heavily on the clause "all . . . royalties, mineral interests and/or overriding royalty interests" while downplaying the limiting language in the remainder of the sentence. We do not adopt the Appellees' singular focus on the broad language of the "and/or" clause; instead we interpret the sentence by viewing it in its

entirety.[6] The rest of the sentence limits the Deed's conveyance to the specific interests "as foreclosed" in the Tax Suit, "as described in the Order of Sale," and makes reference to an exhibit attached to the Sheriff's Deed itself. Viewing the sentence as a whole, the Sheriff's Deed conveys any interest that could be categorized as a royalty, mineral interest, or overriding royalty interest owned by the Tax Debtors in the subject tract, as long as the interest: (1) is described in the exhibit to the Sheriff's Deed; (2) had been foreclosed upon in the Tax Judgment; and (3) was included in the Order of Sale. Because we have already determined that the only interest foreclosed upon in the Tax Judgment was Albert's royalty interest under the Meriwether Lease, that is the only interest that could possibly fit into the explicit limitations of the Sheriff's Deed, but we will briefly analyze the exhibit attached to the Sheriff's Deed, as well as the Order of Sale.

Albert and Mr. Griffith's life estate are listed as Tax Debtors on the third page of Exhibit A to the Sheriff's Deed. The page where the Tax Debtors' names are found has a column labeled "Defendant['s] Name[,]" another column labeled "All interest owned by Defendant in the following Lease Names[,]" and another three columns for the legal description of the applicable subject tracts, including the section number, block number, and survey name. Adjacent to both relevant Tax Debtors' names, under the second column labeled "All interest owned by Defendant in the following Lease Names[,]" is the word Meriwether. We interpret this exhibit as conclusive evidence that the Sheriff's Deed only purported to convey interests in the Meriwether Lease that were previously owned by the Tax Debtors. Magnolia concedes in its briefing—and we agree—that the possibility of reverter "derived not from the Meriwether Lease[.]" Whereas a royalty

---

[6] The use of "and/or" in legal documents often leads to confusion or ambiguity. *See* BRYAN A. GARNER, THE REDBOOK: A MANUAL ON LEGAL STYLE § 1.84, at 58 (3d ed. 2013) (referring to "and/or" as a "grammatical abomination" unfit for legal writing because it is inherently ambiguous). Here, as Appellants suggest, this sentence may have been written to be intentionally vague so that it would encompass a variety of different types of interests, which were more specifically described in the attached exhibit. Indeed, the use of the combined conjunction "and/or" becomes less vague when combined with the limiting language in the rest of the sentence.

interest is explicitly set forth in a mineral lease, a possibility of reverter is not; rather, the possibility of reverter's existence represents the difference between a conveyance in fee simple and one in fee simple determinable. *See Jupiter Oil Co. v. Snow*, 819 S.W.2d 466, 468 (Tex. 1991).

The Order of Sale is dated March 3, 1999, and authorizes the Reeves County Sheriff to sell certain properties foreclosed upon by the Tax Judgment. Like the Sheriff's Deed, it also contains an exhibit describing the property interests the sheriff had the authority to sell. The exhibit to the Order of Sale is a list of tax debtors, along with the specific property interests and the amount owed. The relevant interests that were previously owned by the Tax Debtors are listed on the tenth page of the exhibit, and each description includes the word "Meriwether" and the 0.005952 decimal that correlates with each Tax Debtor's formerly owned royalty interest. We determine that the plain language of the Order of Sale only gave the sheriff the authority to sell the royalty interests previously owned by the Tax Debtors.

In summary, the Sheriff's Deed did not convey, or even purport to convey, Albert's interest in a possibility of reverter. The Sheriff's Deed only transferred ownership of Albert's royalty interest under the Meriwether Lease. Albert retained ownership of his interest in the surface estate, which carried with it the possibility of reverter.

### 6. Release of the Meriwether Lease (2012–13)

When the event upon which a defeasible estate is meant to end is not probable within a reasonably short period of time, a possibility of reverter has been described as having "no ascertainable value." *See Leeco Gas & Oil Co. v. Nueces County*, 736 S.W.2d 629, 630-31 (Tex. 1987) (citing RESTATEMENT OF PROPERTY § 53 comment b (1936)). Here, this case presents a somewhat unusual situation in that the event terminating the Meriwether Lease occurred thirteen years after the foreclosure of Albert's royalty interest. In October of 2012, the well on the subject property—the Meriwether Well—stopped producing and the working-interest owners then

18

released the leasehold interest on April 24, 2013. At the occurrence of that event, the royalty interest under the Meriwether Lease ceased to exist, meaning Magnolia, as successor to the tax-sale purchaser M Brad Bennett, Inc., no longer owned anything. Instead, Albert's interest in the possibility of reverter transformed from a contingent estate into a fee simple ownership of his share of the mineral estate.

In summary, the possibility of reverter could not have been foreclosed upon because it was a non-taxable interest, meaning there were no delinquent taxes on which a lien could attach. Similarly, the possibility of reverter could not have been foreclosed upon along with the royalty interest because it did not derive from the royalty interest, nor was it attached to the royalty interest; in fact, the possibility of reverter remained attached to the surface estate. This conclusion is supported by the exhibit to the Tax Judgment, which made explicit reference to the royalty interest and no mention of the possibility of reverter. Because only the royalty interest was foreclosed, that was all that could be conveyed by the Tax Deed, as evidenced by the limiting language in the body of the Deed, as well as the exhibit to the Deed, which continued to describe the interest conveyed as being under the Meriwether Lease. Albert continued to own the possibility of reverter until he conveyed it to the Trust. When the lease terminated, the mineral estate reverted to the Trust.

### D. Procedural Bars

Lastly, Magnolia and Diamondback frame the underlying suit to quiet title as a collateral attack on the validity of the Tax Judgment and Sheriff's Deed. As such, in the motion for summary judgment that was granted—and now on appeal—Magnolia and Diamondback argue two threshold challenges to the perceived collateral attack: (1) that the statute of limitations in Section 33.54(a) of the Texas Tax Code bars a collateral attack on the Tax Judgment and Sheriff's Deed, and (2) that the Appellants did not meet the statutory prerequisite of depositing an amount equal to the

19

delinquent tax before their attack on the tax foreclosure.

Regarding the statute of limitations defense, the Trust and Ridgefield repeatedly assert that they do not challenge the validity of the Tax Judgment or subsequent sheriff's sale of Albert's royalty interest. They readily concede that the Tax Judgment appropriately foreclosed upon Albert's royalty interest under the Meriweather Lease, and that the royalty interest was never transferred to the Trust. The Trust and Ridgefield's narrow argument is that the Tax Judgment only foreclosed—and the Sheriff's Deed only conveyed—Albert's royalty interest, not his possibility of reverter. Because we agree the case presents a question of proper interpretation of the Tax Judgment and Sheriff's Deed in accord with Texas Law and the plain language of the documents, as opposed to a collateral attack on the validity of these instruments, we conclude that Appellants' claims to quiet title are not barred by any statute of limitations.

Regarding the failure to deposit funds into the registry, again, Appellants do not challenge the foreclosure of the royalty interest, which is the interest upon which the delinquent taxes were assessed and due. They only argue that the possibility of reverter was not foreclosed upon or sold. The possibility of reverter is a non-taxable interest; as such, there were no taxes due and there was no amount to deposit. *See Texas Turnpike Co.*, 271 S.W.2d at 402. We conclude that Appellants claims to quiet title in the mineral estate are not barred by their failure to deposit funds into the registry that correlate to unpaid taxes on the royalty interest under a former lease.

For the foregoing reasons, we sustain Appellants' four related issues which we have combined into one.

## IV. CONCLUSION

Accordingly, we reverse the judgment of the trial court and render judgment in favor of Appellants. *See* TEX.R.APP.P. 43.2(c).

20

GINA M. PALAFOX, Justice

May 5, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.